**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHAZ EBERT, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 20 C 04679 |
| | ) | |
| FRANCES GECKER, as Chapter 7 | ) | Judge John J. Tharp, Jr. |
| Trustee of the Bankruptcy Estate of | ) | |
| Emerald Casino, Inc., | ) | (Bankr. No. 02 B 22977) |
| | ) | |
| Appellee. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Appellant Chaz Ebert, a putative claimant in Emerald Casino, Inc.'s Chapter 7 bankruptcy case, appeals from a sustained objection to her claim against the estate for reimbursement of funds owed under a provision in her stock subscription conditioning issuance of Emerald stock on approval by the Illinois Gaming Board. Approval was never received, so her stock never issued; and thus, per her stock subscription, she has a contractual right to repayment. Ms. Ebert argues this right should be characterized as a general unsecured claim and not, as the bankruptcy court held, an equity interest. This Court agrees that Ms. Ebert's right is properly characterized as a general unsecured claim, but because it is also subject to mandatory subordination by 11 U.S.C. § 510(b) and therefore equivalent to an equity interest for distribution purposes, the bankruptcy court's order is affirmed.

# I. BACKGROUND[1]

Emerald Casino, Inc. began operating a riverboat casino in 1992 pursuant to one of ten gaming licenses then available in Illinois.[2] It could not compete with its Iowan counterparts on the Mississippi River however, and so in 1997, after shuttering its casino, Emerald lobbied the Illinois General Assembly for help. And help it did. In May 1999, the General Assembly amended the Illinois Riverboat Gambling Act to provide Emerald—and only Emerald—an exclusive right to relocate its moribund gaming license to a landed location (Rosemont, Illinois would be eventually named). *See* 230 Ill. Comp. Stat. 10/11.2(a). As a condition of the amendment, Emerald was required to attain at least 20% minority and female ownership. *See id.* § 11.2(b).

Ms. Ebert was one such prospective owner. She, like twenty-two other minority and female investors (the "Statutory Investors"), paid Emerald $750,000 and signed a stock subscription in September 1999 for approximately thirty-five shares of no-par value common stock. The stock subscription, however, called for the stock to be held in escrow until the Illinois Gaming Board (IGB)—a subagency of the Illinois Department of Revenue—approved her as an acceptable owner, at which time her stock certificates would issue. If the IGB disapproved, her money was to be returned and the stock subscription would terminate. As it happened, the IGB never granted or denied approval of Ms. Ebert or any other Statutory Investor. It instead became preoccupied with a fraud investigation focused on Emerald's principals.

---

[1] The factual and legal saga that gave rise to this matter is complex and spans several decades. For an extensive account, see *In re Emerald Casino, Inc.*, 530 B.R. 44, 59–171 (N.D. Ill. 2014), *aff'd in part, vacated in part*, 867 F.3d 743 (7th Cir. 2017). The background set forth in this ruling is limited to information necessary to understand the present dispute.

[2] Emerald originally incorporated under the name HP, Inc. The company changed its name on August 12, 1999.

Within weeks of Ms. Ebert signing her stock subscription, the IGB launched what would become a sixteen-month investigation of Emerald. At the time, Emerald had already begun preparing to build a casino in Rosemont, Illinois, and the IGB suspected Emerald and certain Rosemont officials of nefarious dealings. In March 2001, a month after its investigation concluded, the IGB issued a five-count disciplinary complaint accusing Emerald of giving the IGB false or incomplete information about its agreements, ownership transfers, and construction activities. *See generally* Ill. Admin. Code tit. 86, §§ 3000.140, 235(a). The complaint also accused Emerald of selling shares to persons associated with organized crime. *See generally id.* § 3000.110(a)(5). Consequently, the IGB revoked Emerald's gaming license. *See also Emerald Casino v. Ill. Gaming Bd.*, No. 4-06-0051, 2007 Ill. App. Unpub. LEXIS 3, at *137, *195 (May 30, 2007), *reported in table*, 372 Ill. App. 3d 1106 (affirming the IGB's revocation decision but overturning the IGB's findings related to organized crime).

The loss of Emerald's gaming license (its principal asset) prompted a group of its creditors to file an involuntary bankruptcy petition in 2002, which was shortly thereafter converted to a Chapter 11 proceeding. In response, Ms. Ebert filed a proof of claim for recovery of the $750,000 she paid Emerald pursuant to her stock subscription. She also filed a proof of interest based on the shares of common stock the stock subscription contemplated she would receive.

In 2006, Ms. Ebert and all but three of her fellow Statutory Investors brought a federal action against Emerald's directors and officers alleging violation of the Racketeer Influence and Corrupt Organizations (RICO) Act and liability under various state law theories, including fraud, breach of fiduciary duty, and conspiracy. The federal court, however, held the RICO claim was barred by the Private Securities Litigation Reform Act, 18 U.S.C. § 1964(c), and declined to

exercise supplemental jurisdiction over the state law claims. *Payton v. Flynn*, No. 06-cv-00465, 2006 WL 3087075, at \*9 (N.D. Ill. Oct. 26, 2006). Sixteen of these federal plaintiffs (the "*Payton* Plaintiffs") then reasserted their state law claims in the Circuit Court of Cook County. Fatefully, Ms. Ebert declined to join them.[3]

Meanwhile in bankruptcy court, a Committee of Unsecured Creditors was contemplating its own derivative action against Emerald's directors and officers. When the Committee informed the bankruptcy court in February 2008 of such intent, the court decided to convert the case to a Chapter 7 proceeding and appoint a trustee—Frances Gecker—to pursue the Committee's claims. Soon after, Ms. Gecker saw an opportunity to align the estate's interests with those of the *Payton* Plaintiffs. The *Payton* Plaintiffs—as a subset of the Statutory Investors—had filed proofs of claim against the estate based on their stock subscriptions and were contending that their repayment rights under the subscription agreement were general unsecured claims because the IGB never approved, and thus Emerald never effected, issuance of their stock. The *Payton* Plaintiffs were also contesting a bankruptcy stay of their state action against Emerald's directors and officers. Rather than challenge the *Payton* Plaintiffs on these issues, Ms. Gecker joined forces.

In a settlement agreement approved by the bankruptcy court in November 2008, the *Payton* Plaintiffs agreed to assign their state law claims to Ms. Gecker so she could coordinate a joint prosecution of the claims of both the *Payton* plaintiffs and the Creditors Committee against Emerald's directors and officers. In return, Ms. Gecker agreed to split with the *Payton* Plaintiffs any recovery she realized on account of these claims (after deduction of attorneys' fees) and—

---

[3] No explanation has been given as to why Ms. Ebert chose not to participate in the *Payton* Plaintiffs' state court action. *See* R. at 326–27, ECF No. 8-2 (May 23, 2019 Bankr. Hr'g Tr.).

importantly—to subordinate the *Payton* Plaintiffs' claims against the estate to the claims of general unsecured creditors ***only until*** such creditors received a distribution equal to 75% of their claims, at which point the *Payton* Plaintiffs would share pro rata with other unsecured creditors. R. at 198–99, ECF No. 8-2 (Settlement Agreement). Ms. Ebert did not object to or ask to join in this settlement agreement.

After the settlement agreement was approved, Ms. Gecker (alternatively, the "Trustee") removed the *Payton* Plaintiffs' state law claims to bankruptcy court. There, ruling that the claims were severable from the bankruptcy's core proceedings, the bankruptcy judge abstained, thus thwarting the Trustee's plan to prosecute all claims against Emerald's directors and officers in one action. Eventually in November 2009, while back in the Circuit Court of Cook County, all of the *Payton* Plaintiffs' state law claims were dismissed on various grounds, including the time bar contained in the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/13. At that point, what remained in bankruptcy court were the claims originally asserted on behalf of the Committee of Unsecured Creditors. These—following a motion for recusal and subsequent withdrawal of the bankruptcy court's referral—went to a bench trial before Judge Pallmeyer, who in September 2014 held six Emerald officers liable in the aggregate amount of $272 million for breach of Emerald's shareholders' agreement. *In re Emerald Casino, Inc.*, 530 B.R. 44, 237–38 (N.D. Ill. 2014), *aff'd in part, vacated in part*, 867 F.3d 743 (7th Cir. 2017).[4]

In the years following entry of this judgment, the Trustee made two distributions to the *Payton* Plaintiffs in accordance with their 2008 settlement agreement. First, in April 2016, after collecting via settlement from two of the six Emerald officers, the *Payton* Plaintiffs were paid

---

[4] The Seventh Circuit found error only in Judge Pallmeyer's decision not to hold the defendants jointly and severally liable. *In re Emerald Casino, Inc.*, 867 F.3d 743, 763–66 (7th Cir. 2017).

their original attorneys' fees and $11.4 million (representing half of the Trustee's net recoveries). Ms. Ebert did not object to this distribution. Then in April 2019, the Trustee again split further recoveries with the *Payton* Plaintiffs and paid them an additional $15.4 million.

Ms. Ebert objected to the second distribution. Her contention was that because the *Payton* Plaintiffs' claims against the estate only totaled $24.0 million, the second distribution represented a $2.8 million windfall to the *Payton* Plaintiffs. She claimed this was inequitable because she, as a Statutory Investor, had an identical claim which was yet to be awarded any distribution. This objection was overruled by the bankruptcy court and affirmed on appeal. The bankruptcy court reasoned that the *Payton* Plaintiffs' distribution rights derived from their settlement agreement with the Trustee and not the original proofs of claim they filed as Statutory Investors. Therefore, Ms. Ebert's decision to forego joining the *Payton* Plaintiffs in settlement with the Trustee precluded her from joining them in recovery pursuant to that agreement. *In re Emerald Casino, Inc.*, No. 19-cv-04376, 2020 WL 918988, at *2–4 (N.D. Ill. Feb. 26, 2020).

Finally, in August 2019, the Trustee raised an omnibus objection to twenty-six proofs of claim submitted by similarly situated Emerald investors; among them were two claims from Ms. Ebert: one was the proof of claim Ms. Ebert submitted in 2002 for the $750,000 she paid towards the Emerald stock she never received; the second was a proof of claim she submitted in 2015 that amended the first to include an additional $285,954 worth of accrued interest and attorneys' fees.[5] The Trustee objected, contending that these claims should be treated as equity interests and not as general unsecured claims. *See* Fed. R. Bankr. P. 3007(d)(7) (permissible grounds for omnibus objection). The bankruptcy court sustained the Trustee's objection. It held

---

[5] In actuality, Ms. Ebert's 2002 proof of claim included $172,597 worth of accrued interest and attorneys' fees on top of her $750,000 principal. The 2015 proof of claim simply added $113,357 to this figure.

that Ms. Ebert's claims should be treated as equity interests or, in the alternative, were subject to mandatory subordination pursuant to 11 U.S.C. § 510(b). *In re Emerald Casino, Inc.*, 622 B.R. 44, 47, 49–51 (Bankr. N.D. Ill. 2020). It is this order Ms. Ebert now appeals.

## II. DISCUSSION

This Court sits in review of the bankruptcy court's final order pursuant to 28 U.S.C. § 158(a). Its conclusions of law are reviewed de novo and its findings of fact are reviewed for clear error. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). Likewise, mixed questions of law and fact are subject to de novo review. *Id*.

### A. Characterization of Ms. Ebert's Claims

Ms. Ebert's principal contention is that the bankruptcy court erred in treating her claims against the estate as or equivalent to equity interests. The bulk of the bankruptcy court's opinion concerned whether Ms. Ebert's claims should be considered subordinated claims under 11 U.S.C. § 510(b)—a status, for Ms. Ebert's purposes, equivalent to an equity interest. But despite the attention the bankruptcy court gave that question, it held it was immaterial because it was subsumed by the larger question of whether Ms. Ebert's claims were claims at all. *See Emerald*, 622 B.R. at 50. On this question, the bankruptcy court held that Ms. Ebert's claims were, categorically, not claims but equity interests. *Id.* at 47. This Court disagrees with that conclusion but agrees with the bankruptcy court's alternative view that Ms. Ebert's claims must be subordinated to those of unsecured creditors pursuant to section 510(b).

To begin, it is important to acknowledge the distinction between interests and claims. The term *interest* is not defined by the Bankruptcy Code, but it refers to an equity interest in property of the debtor (*e.g.*, common stock). Robert E. Ginsberg et al., Ginsberg & Martin on Bankruptcy § 10.02 (5th ed. 2021). A *claim*, on the other hand, is defined broadly as any "right to payment"

by the debtor. 11 U.S.C. § 101(5); *In re S. Beach Sec., Inc.*, 606 F.3d 366, 376 (7th Cir. 2010). Ms. Ebert's stock subscription affords her a right to payment.

A *stock subscription*, to be clear, is "[a] written contract to purchase newly issued shares of stock . . . ." *Black's Law Dictionary* (11th ed. 2019). The relevant portion of Ms. Ebert's stock subscription provides:

> In the event that the [IGB] determines that the undersigned is an acceptable owner of the Company, the Issuer shall credit the Purchase Price as payment toward the Shares and promptly issue the Shares to the undersigned. ***In the event that the IGB determines that the undersigned is not an acceptable owner*** of the Issuer, (a) this agreement shall immediately terminate . . ., (b) the Issuer shall not issue the Shares, and (c) ***the Issuer shall*** . . . ***return the Purchase Price*** without interest to the undersigned within ninety days . . . .

R. at 385, ECF No. 8-2 (Subscription Agreement) (emphasis added). Thus, Ms. Ebert has a contractual right to repayment of her purchase price given that the IGB did not determine that she was an acceptable owner.

In this Court's view, Ms. Ebert's contractual right to payment by Emerald, the debtor, falls squarely within the Bankruptcy Code's definition of *claim*: it is a right to payment by the debtor. And since claims for contract damages are routinely classified as general unsecured claims—*see, e.g.*, *Nelson v. Stewart*, 422 F.3d 463, 473 (7th Cir. 2005); *In re Health Mgmt. Ltd. P'ship*, 332 B.R. 360, 363 (Bankr. C.D. Ill. 2005); *In re Nat'l Steel Corp.*, 316 B.R. 287, 304 (Bankr. N.D. Ill. 2004); *In re Res. Tech. Corp.*, 254 B.R. 215, 221 (Bankr. N.D. Ill. 2000); *In re Ind. Grocery Co.*, 138 B.R. 40, 50 (Bankr. S.D. Ind. 1990)—this Court finds no cause to characterize Ms. Ebert's claims otherwise.

In holding that "Ebert holds an equity interest," the bankruptcy court reasoned that because "Ebert's claims are prima facie evidence of the amount and the ***type*** of claim," and because "the face of [each] claim shows [they are] for a 'stock subscription,'" they should be

treated as equity interests. *Emerald*, 622 B.R. at 47, 49 (emphasis added). But in treating the proofs of claim as prima facie evidence of their characterization as claims, the bankruptcy court appears to have misquoted Bankruptcy Rule 3001, which states that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the ***validity*** and ***amount*** of the claim"—not of the "type" of claim. Fed. R. Bankr. P. 3001(f) (emphasis added). More importantly, even if a proof of claim is also prima facie evidence of its type, prima facie evidence only establishes a fact in the absence of contradictory evidence. Here, the whole of Ms. Ebert's opposition to the Trustee's claim objection below adequately rebutted any presumptive characterization her proofs of claim may have facially established. She persistently argued that her claims were based on the conditional reimbursement provision within her stock subscription and not on stock ownership, R. at 539–40, ECF No. 8-2 (Resp. to Omnibus Claim Obj.); she introduced a letter from Emerald reinforcing this provision's import, *id.* at 547; and she cited various acknowledgments by the Trustee that Ms. Ebert's stock ownership never vested, *id.* at 540. In short, regardless of whether Ms. Ebert's proofs of claim are prima facie evidence of their type, such evidence has been sufficiently rebutted.

In further support of its holding that Ms. Ebert's claims were in fact equity interests, the bankruptcy court appears to have placed considerable weight on Ms. Ebert's putative *de facto* status as a shareholder. Although the IGB never formally approved of Ms. Ebert as a shareholder, Ms. Ebert enjoyed shareholder privileges: she was party to the shareholders' agreement and attended shareholder meetings where her vote was solicited. Emerald also identified Ms. Ebert as a shareholder in all relevant books, records, and tax filings. Thus, the bankruptcy court concluded that because "Emerald treated [Ms. Ebert] as a shareholder in every way," "her interest should be treated as equity." *Emerald*, 622 B.R. at 49, 51.

This Court takes no issue with the bankruptcy court's finding that Ms. Ebert was treated as a shareholder in all but name. The issue is that Ms. Ebert's status is not relevant to the claim-interest taxonomy. *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 658 (7th Cir. 2010) (The character of a claim "focuses on the underlying substance of the disputed transaction . . . ."); *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749 (6th Cir. 2001) (listing eleven factors to consider when recharacterizing a claim from debt to equity). A claim, to reiterate, is for something **owed by** the estate, whereas an interest is some **ownership of** the estate. The substance of the proof of claim, rather than the identity of the claimant, is what determines its characterization; nothing precludes a shareholder from also being a creditor. In submitting her claim, Ms. Ebert was not seeking recovery of principal or equity in Emerald; she was seeking return of funds owed under the repayment provision of her stock subscription. The bankruptcy court's reliance on Emerald's treatment of Ms. Ebert as a *de facto* shareholder does not, therefore, determine the characterization of Ms. Ebert's putative claim.

Arguing on appeal, the Trustee echoes the bankruptcy court's rationales but adds that Ms. Ebert's proofs of claim should be considered judicial admissions of their character. Appellee Br. at 13–14, ECF No. 17. Those proofs of claim are quite succinct. Claim No. 65, dated December 20, 2002, is for Ms. Ebert's purchase price of $750,000 plus an approximation of accrued interest and attorneys' fees. R. at 399–400, ECF No. 8-2. Claim No. 124, dated March 11, 2015, updates the approximate figure and claims a total of $1,035,954. *Id.* at 403–06. Both proofs of claim however, are simple, two-page form documents containing only basic information. On both, in the block titled "Basis for Claim," Ms. Ebert answered "Stock Subscription." *Id.* at 399, 403. The Trustee contends that this statement estops Ms. Ebert from arguing she has anything but an equity interest.

"A judicial admission is a statement, normally in a pleading, that negates a factual claim that the party making the statement might have made or considered making." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010). Importantly, to qualify as a judicial admission, a statement must be "deliberate, clear and unambiguous." *Id.* (quoting *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)). Here, Ms. Ebert's stated basis for her claim ("Stock Subscription") does not ***unambiguously*** denote stock ownership despite the Trustee's assertion to the contrary. This stated basis most readily suggests that Ms. Ebert's claim is based either on the contingent interest in common stock Ms. Ebert purchased ***or*** the contingent refund Emerald promised. Without further context (and the proofs of claim provide none), it is simply not clear that Ms. Ebert's claim is the former.

Further context, the Trustee says, is supplied by Ms. Ebert's separate proof of interest. Ms. Ebert filed one for "Common Stock" at the same time she filed her original 2002 proof of claim. R. at 401, ECF No. 8-2. Unlike her proofs of claim, this proof of interest is unambiguously premised on equity holder rights, yet there is no indication that Ms. Ebert intended these documents to be coterminous. Presuming otherwise—as the Trustee's argument requires—would render Ms. Ebert's proofs of claim superfluous. That presumption is unreasonable. No one contests the fact that Emerald never issued Ms. Ebert's common stock. And given, then, that Ms. Ebert's equity interest never actually vested, the more reasonable presumption is that Ms. Ebert's proofs of claim are based on something other than an equity interest. Therefore, the meaning the Trustee ascribes to Ms. Ebert's proofs of claim (or her proof of interest) cannot be held against Ms. Ebert as judicial admissions.

### B.  11 U.S.C. § 510(b) Subordination

Having found Ms. Ebert to possess a general unsecured claim, the analysis turns to whether that claim is subject to mandatory subordination pursuant to 11 U.S.C. § 510(b). Although the bankruptcy court below couched its section 510(b) analysis as "unnecessary," *Emerald*, 622 B.R. at 50, it evaluated the question in earnest and concluded section 510(b) would apply to Ms. Ebert even if, contrary to its principal holding, she possessed a general unsecured claim rather than an equity interest. This Court agrees.

Section 510(b) reads:

> For the purpose of distribution under this title, ***a claim*** . . . ***for damages arising from the purchase or sale of*** . . . ***a security*** [of the debtor] . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added). There is no question here that the common stock contemplated by Ms. Ebert's stock subscription represents a "security." *See* 11 U.S.C. § 101(49) (defining *security*); *see also Payton v. Flynn*, No. 06-cv-00465, 2006 WL 3087075, at *8 (N.D. Ill. Oct. 26, 2006) (finding Ms. Ebert's stock subscription constitutes an "investment contract" and thus a "security" under federal securities laws). The question is whether the contract damages she claims "arise from" the purchase of such stock. If so, section 510(b) mandates that her general unsecured claims receive distributions in parity with equity interest holders (and subordinate to unsecured creditor claims).[6]

---

[6] The distribution priority a subordinated claim receives depends on the nature of the underlying security claim or interest from which the subordinated claim arose. 11 U.S.C. § 510(b). When the underlying security interest is common stock, there is no functional difference for distribution purposes between holding the claimant to be an equity interest holder or a general unsecured creditor with a subordinated claim. The distinction is important in other contexts, however. For instance, only creditors can file an involuntary petition, vote for a Chapter 7 trustee, or sit on an unsecured creditors committee. 11 U.S.C. §§ 303, 702, 1102.

Broadly speaking, "[f]or a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009). Circuit courts agree the contours of this causal relationship are ambiguous. *See, e.g.*, *id.* at 418; *In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006); *In re Telegroup, Inc.*, 281 F.3d 133, 138 (3d Cir. 2002); *In re Geneva Steel Co.*, 281 F.3d 1173, 1178 (10th Cir. 2002); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 830 (9th Cir. 2001).[7] Thus, "the policy rationales behind Section 510(b) must always guide its interpretation and application to particular facts." *Matter of Linn Energy, L.L.C.*, 936 F.3d 334, 341 (5th Cir. 2019).

Section 510(b)'s purpose is clearly evidenced by its legislative history—principally, the House Report on the 1978 Bankruptcy Reform Act, wherein Congress attributes section 510(b)'s inspiration to a journal article by Professors Slain and Kripke. *See* H. Rep. No. 95–595, at 194–96 (1977), *citing with approval* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy–Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973); *see also Med Diversified*, 461 F.3d at 255–56 (noting Slain and Kripke's article as the accepted starting-point for section 510(b) analysis). The takeaway from Professors Slain and Kripke was that without mandatory subordination, disappointed shareholders could recover their investment losses by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in bankruptcy proceedings. *Telegroup*, 281 F.3d at 140–41. This, fundamentally, would

---

Likewise, only equity interest holders can approve certain Chapter 11 plans. 11 U.S.C. § 1126(d).

[7] The Seventh Circuit has yet to speak on the scope of section 510(b). As a matter of first impression within the Seventh Circuit, however, Judge Pallmeyer addressed the question in *In re Pre-Press Graphics Co.*, 307 B.R. 65 (N.D. Ill. 2004). Her analysis aligns with non-Seventh Circuit caselaw.

subvert bankruptcy's absolute priority rule, which holds that "stockholders seeking to recover their investments cannot be paid before provable creditor claims have been satisfied in full." *Id.* at 139 (quoting Slain & Kripke, *supra*, at 261). The rule is premised on the dissimilar risk-return expectations held by shareholders and creditors. *Id.*; *see Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 646 F.3d 401, 408 (7th Cir. 2011) ("The creditors' priority in bankruptcy mirrors the contractual allocation of risk and reward between creditors and shareholders.").

As for those dissimilar risk-return expectations, "[s]hareholders expect to take more risk than creditors in return for the right to participate in firm profits." *Betacom*, 240 F.3d at 829; *see* Elizabeth Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775, 792 (1987) ("An almost axiomatic principle of business law is that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse—up to the full amount of their investment."). The risk of illegality in the issuance of stock is also borne completely by shareholders. *Telegroup*, 281 F.3d at 140; *see* Slain & Kripke, *supra*, at 288 ("It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered."). In contrast, creditors "only expect[] repayment of a fixed debt" and, crucially, "extend credit in reliance on the cushion of investment provided by the shareholders." *Betacom*, 240 F.3d at 829.

Because these dissimilar risk-reward expectations animate the absolute priority rule, they also guide the application of section 510(b). Hence, a claim is only said to have "arisen from" the purchase or sale of a security "if [a claimant] (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool

presumably relied upon by creditors in deciding whether to extend credit to the debtor." *Med Diversified*, 461 F.3d at 256.

Notably, shareholder status is again not relevant to this formulation. The parties here have argued considerably over the bankruptcy court's holding that Ms. Ebert should be identified as a shareholder despite never receiving her stock. But it is the nature of the claim asserted, not the claimant's identity, which determines the applicability of section 510(b). *See Telegroup*, 281 F.3d at 144 n.2 ("[I]n enacting § 510(b), Congress did not intend to subordinate every claim brought by a shareholder, regardless of the nature of the claim. . . . [Nothing] require[s] the subordination of a claim simply because the identity of the claimant happens to be a shareholder . . . ."); *Betacom*, 240 F.3d at 829 ("Nothing in § 510(b)'s text requires a subordinated claimant to be a shareholder."); *see also In re Angeles Corp.*, 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) ("If Congress had wanted to subordinate ***all*** claims of security holders to an equity position, regardless of the source of the claim, Congress would have worded Section 510(b) to say: 'All claims made by security holders, regardless of the source of the claim, shall be subordinated to an equity class . . . .'").

The actual sale or physical possession of a security is also not necessary for a claim to be considered "arising from" the purchase or sale of a security. In *Betacom*, the Ninth Circuit considered whether a claim for breach of a merger agreement should be subordinated. 240 F.3d at 826–27. Per the agreement, the claimants relinquished their interest in the acquired company in exchange for the debtor's stock, which was to be held in escrow and transferred after an audit. *Id*. The debtor, however, failed to conduct the audit and never transferred the shares. *Id*. The claimants argued this amounted to unlawful conversion. *Id.* at 829–30. No matter, the Ninth Circuit explained: "Even though the [claimants] never received their stock, it remains true that

15

they decided to enter the Merger Agreement with the understanding that they faced the risk that [the debtor's] [Initial Public Offering] could fail and that [the debtor] might go bankrupt." *Id.* at 830. Plus, "creditors relied on the . . . assets transferred by the [claimants to the debtor] in their decisions to extend credit to [the debtor]." *Id*. Therefore, even though the claimants never received their promised shares, their claims required subordination. *Id.* at 832.

Similarly in *Med Diversified*, the Second Circuit subordinated the claim of an executive whose severance payment agreement with the debtor obligated the debtor to exchange its stock with stock the executive owned in another company. 461 F.3d at 254–55, 257. That transaction, however, did not occur prior to the debtor filing bankruptcy, and the executive claimed damages for breach. *Id*. Contesting subordination, the executive argued the debtor's promise to exchange stock was no different than a promise to purchase his stock with cash. *Id.* at 256. The Second Circuit reasoned, nevertheless, that the executive had bargained not for cash but to become a shareholder in the debtor. *Id*. His damages, too, were connected to the value of the debtor's stock, not fixed debt. *Id.* at 257. Therefore, the fact that the executive was never issued his stock did not prevent subordination of his claim. *Id.* at 259.

Considering these principles, Ms. Ebert's claims must be subordinated. As a preliminary matter, this Court notes (and the parties do not contest) that there is a causal relationship between Ms. Ebert's claims and the purchase of a security: her claims would not exist but-for the purchase of common stock contemplated by her stock subscription. This relationship's proximate quality is also within the ambit circumscribed by section 510(b)'s two guiding rationales—that is, subordination is required whenever a claimant takes on the risk and return expectations of a shareholder or seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor.

16

As for the first rationale, by executing her stock subscription, Ms. Ebert sought to take on the risk and return expectations of a shareholder, not a creditor. The sole benefit of Ms. Ebert's stock subscription was that she would become an Emerald owner and would share in Emerald's potential success. The fact that she never actually became a shareholder does not change the risk-reward expectations inherent in her bargain.

Ms. Ebert frames it differently. She argues that because her investment was conditional, the rewards associated with stock ownership were contingent upon IGB's approval of her as a shareholder. She maintains that unless and until she received such approval, she was not entitled to share in Emerald's profits. In this vein, she characterizes her purchase money as debt made payable upon IGB disapproval. She is not alone in this characterization, as three other Statutory Investors of the six total who were subject to the Trustee's omnibus claim objection submitted proofs of claim based on "money loaned." R. at 383, 393, 470, ECF No. 8-2 (First Omnibus Claim Obj.).

Ms. Ebert's characterization might be more persuasive if not for the fact that the alleged "loan" she conditionally gave Emerald was interest-free. Interest is the conventional consideration offered for debt. But Ms. Ebert's stock subscription made explicit that her purchase money would be returned, if at all, "without interest." *Id.* at 385 (Subscription Agreement). Thus, if she truly considered herself to be a creditor in the interval preceding IGB's approval decision, she failed to bargain as one. In lieu of interest payments, the consideration Ms. Ebert did receive in exchange for her purchase money was a chance to co-own Emerald. And it is this consideration to which Emerald affixed a warning:

> For good and valuable consideration received, the undersigned does hereby acknowledge that . . . the business to be conducted by the Issuer will be of a risky and speculative nature; [and] that the undersigned's investment in the Issuer involves a high degree of

> risk of loss of the undersigned's entire investment in the Issuer . . . .

*Id.* at 389 (Subscription Agreement).

In the same vein, Ms. Ebert also argues that unless and until she received IGB approval, she was not exposed, as a shareholder would have been, to the risk of Emerald's venture. This facet does make Ms. Ebert's claim distinguishable from other section 510(b) cases in the sense that her claim is not tied to the value of Emerald's stock. *Cf. Med Diversified*, 461 F.3d at 257. Given a disapproval by IGB, Ms. Ebert's reimbursement was set at her purchase price regardless of whether Emerald's stock value had soared or tanked. Hence, she maintains that when she executed her stock subscription, the anticipated IGB decision served to mitigate her venture risk.

But it is hard to imagine why she would have held this view ***when she executed her stock subscription***. The inquiry here is into Ms. Ebert's risk and return expectations in the moment she gave money to Emerald. And in ***that*** moment, Ms. Ebert was ostensibly privy to everything on which the anticipated IGB decision was going to be based. This is because the IGB decision concerned ***her*** intrinsic characteristics, whether ***she*** was an acceptable owner (*e.g.*, whether she was female or a minority or—more conceivably—was a straw owner or had ties to organized crime). Thus, Ms. Ebert understood whether she was eligible to become a Statutory Investor prior to executing her stock subscription, and so it is implausible—given that she knowingly signed it anyway—that she expected anything but IGB agreement. If, alternatively, approval of her shareholder status turned on some intrinsic quality of Emerald, it would be more plausible to view the IGB decision as Ms. Ebert's bargained-for escape hatch. In that instance, the IGB decision could have uncovered negative information about Emerald then unknown to Ms. Ebert and conceivably mitigated the risk of such discovery through her subsequent disapproval. But that is not the case here. Here, Ms. Ebert's shareholder eligibility was wholly independent from

Emerald's venture risk.[8] Therefore, it should not have been expected that IGB's decision on the former would insulate Ms. Ebert from the latter.

Ms. Ebert's claims are also somewhat exceptional for the fact that they do not directly implicate the type of risk exclusive to shareholders—*i.e.*, the risk of illegality in the issuance of a security. All claims subject to section 510(b) implicate this type of risk, such as the risk of fraud, breach of contract, or violation of a securities regulation by the debtor (notably, the illegality need not be contemporaneous with the actual issuance of its associated security). *See Telegroup*, 281 F.3d at 140–44. But here, Ms. Ebert's claim is not directly premised on any unlawful conduct. The record does not suggest Emerald fraudulently induced or executed Ms. Ebert's stock subscription. Emerald also committed no breach by retaining Ms. Ebert's purchase money: Contractually, Ms. Ebert's reimbursement was due upon IGB's disapproval, but it never formally disapproved of Ms. Ebert as a shareholder. In fact, there is evidence that the IGB never even began investigating the Statutory Investors. *Emerald*, 530 B.R. at 70. Instead, IGB's decision to revoke Emerald's gaming license served as *de facto* disapproval. And when Emerald's involuntary bankruptcy petition swiftly followed, Emerald was legally prohibited from reimbursing the Statutory Investors.[9] Strictly speaking, then, Ms. Ebert's claims are premised on a theory of unjust enrichment rather than breach.

---

[8] In relevant part, Ms. Ebert's stock subscription certified that "no federal or state agency has passed upon the adequacy or accuracy of the information set forth in the Documents, or made any finding or determination as to the Shares as an investment . . . ." R. at 388, ECF No. 8-2 (Subscription Agreement).

[9] The IGB issued formal notice revoking Emerald's license on March 6, 2001. *Emerald*, 530 B.R. at 71. The involuntary bankruptcy petition was filed on June 13, 2002. *Id*. Although Emerald may have voluntarily reimbursed the Statutory Investors in the intervening time period, litigation over IGB's revocation did not finally conclude until November 29, 2007, well after Emerald was drawn into bankruptcy. *Id.* at 74.

This distinction only matters to say that Ms. Ebert's claims are not **directly** based on unlawful conduct. They are, however, **indirectly** so. At bottom, IGB revoked Emerald's license because Emerald violated IGB's rules.[10] Emerald's shareholders' agreement obliged compliance with those rules. R. at 1156, ECF No. 8-2 (Shareholders' Agreement) ("Each Shareholder . . . agrees to comply with the [Riverboat Gambling Act] and all rules and orders of the IGB and shall not commit any acts which would jeopardize the license or a renewal thereof."). And in turn, Ms. Ebert's stock subscription incorporated the shareholders' agreement. *Id.* at 388 (Subscription Agreement) ("The sale, transfer or encumbrance of this certificate is subject to the Shareholders' Agreement . . . ."). Therefore, the risk of illegality which indirectly led to Emerald's inability to repay Ms. Ebert is one she sufficiently assumed.

As for section 510(b)'s second guiding rationale—the equity cushion relied upon by creditors—it too compels subordination of Ms. Ebert's claims. No facet of Ms. Ebert's investment supports viewing it apart from any other capital infusion that creditors may have relied upon in assessing Emerald's credit worthiness. Had the Statutory Investors' purchase money, rather than their stock certificates, been contractually escrowed pending IGB approval, things may have been different. In that case, potential creditors would have understood that Emerald was prohibited from using the Statutory Investors' investments for corporate purposes. But that is not the case here. Upon collection, Emerald listed the Statutory Investors' investments in its "paid-in capital account" and promptly spent the funds. *Emerald*, 530 B.R. at 70, 149; *see*

---

[10] Having spent the Statutory Investors' capital investments immediately upon receipt, Emerald was in no apparent position to repay any of the Statutory Investors even if formal IGB disapproval had come prior to bankruptcy. This, however, was not one of Emerald's cited rule violations. *Emerald*, 530 B.R. at 89 ("Though it appears that Emerald did not have a plan or the funds to refund the payments that it received from the Statutory Investors[] if the IGB did not approve them as shareholders, the IGB made no specific finding that this alone violated any IGB Rule.") (citation removed).

*also* R. at 390, ECF No. 8-2 (Subscription Agreement) ("[T]his Subscription Agreement may not be canceled, revoked, or withdraw . . . . [and Emerald] may use the proceeds . . . for its unrestricted use . . . immediately upon acceptance . . . .").

In summary, Ms. Ebert bargained to become a shareholder; the risks and rewards inherent in that bargain are consistent with those of shareholder expectations; and treating Ms. Ebert as a creditor would be unfair to those creditors who may have relied on her investment. Therefore, section 510(b) mandates subordination. In reaching this conclusion, some relevant sentiments are worth echoing:

> This Court is not unsympathetic to the concerns of investors who fall victim to unscrupulous business practices, and it was certainly not Congress' objective to stifle capital investment in start-up ventures. However, a balance must be struck between the concerns of the average investor and the unsecured trade creditor who provides products and services necessary for the business to succeed and for the investor to earn profits. That is what Congress envisioned by enacting section 510(b) of the Bankruptcy Code and that is the spirit by which this decision is rendered.

*In re PT-1 Commc'ns, Inc.*, 304 B.R. 601, 610 (Bankr. E.D.N.Y. 2004).

### C.   **Equitable Estoppel**

Along with holding that section 510(b) applied to Ms. Ebert's claims, the bankruptcy court also rejected Ms. Ebert's defense that the Trustee was equitably estopped from treating her claims as equity. That ruling is affirmed, albeit for a slightly different reason than the one relied upon by the bankruptcy court.

Ms. Ebert predicated her equitable estoppel defense on the following: Ms. Ebert claimed she spoke with the Trustee at least once a year regarding the status of Emerald's bankruptcy case. R. at 659, ECF No. 8-3 (Decl. of Ebert). During these conversations, the Trustee supposedly "never told [her] that [she] should not expect to receive a recovery from the Debtor's bankruptcy case or that [her] claim would be treated as equity." *Id*. On at least one occasion, the

Trustee also allegedly "informed [Ms. Ebert] that [she] would share in the recovery that was paid to the [*Payton* Plaintiffs] under the [their] Settlement." *Id*. Thus, Ms. Ebert believed "[she] would share in any recoveries from the Trustee's litigation [against Emerald's directors and officers]" and relied upon the Trustee's representations in determining "the likelihood of recovering on [her] claim against Emerald Casino." *Id*.

The bankruptcy court found these allegations insufficient to support equitable estoppel. Equitable estoppel requires reasonable and detrimental reliance on another's misrepresentation. *Matter of Larson*, 862 F.2d 112, 115 (7th Cir. 1988). But Ms. Ebert, the bankruptcy court explained, was unreasonable to think that the Trustee could alter the Bankruptcy Code's priority distribution scheme without court approval. *Emerald*, 622 B.R. at 53. Ms. Ebert also failed to allege a detriment. *Id.* at 53–54. She did not, for instance, detail when the conversations with the Trustee took place nor did she explain what action she took or abandoned because of them. *Id*.

This Court need not delve into these factual issues, for even if the bankruptcy court clearly erred in finding them, it is beyond the bankruptcy court's equitable powers to ignore section 510(b). Those equitable powers stem generally from section 105(a), which provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But "[t]his does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override." *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004); *see Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *Matter of Lloyd*, 37 F.3d 271, 275 (7th Cir. 1994) ("The bankruptcy court

does not have free-floating discretion[] to create rights outside the Code . . . .") (internal quotations removed).

Having found that Ms. Ebert is a general unsecured creditor and not an equity interest holder, section 510(b) provides the bankruptcy court an inflexible statutory command. Notwithstanding any misrepresentations Ms. Ebert may have relied upon, then, the bankruptcy court cannot equitably estop the mandatory subordination of Ms. Ebert's claims.

### D. <u>Judicial Estoppel</u>

Ms. Ebert also appeals from the bankruptcy court's rejection of her judicial estoppel defense. She asserted it in attempt to prevent the Trustee from identifying her as a shareholder. As previously mentioned, the parties thoroughly debated below whether Ms. Ebert was an actual shareholder, and the fact featured prominently in the bankruptcy court's analysis. Ms. Ebert's estoppel position was premised on the fact that the Trustee had argued in previous litigation that the Statutory Investors were not shareholders because they were not issued stock. *See Emerald*, 530 B.R. at 151 n.74. Thus, her argument went, the Trustee is estopped from treating her as a shareholder, and therefore, her claims should not be subordinated. But, as discussed in part II.B, a claimant's identity—shareholder or not—is not pertinent to the operation of section 510(b). Consequently, Ms. Ebert's judicial estoppel defense is irrelevant and does not preclude the Trustee's position that her claims should be subordinated under section 510(b).[11]

---

[11] Ms. Ebert's estoppel position is based on a prior argument by the Trustee that ultimately did not prevail. It is for this reason that the bankruptcy court rejected Ms. Ebert's judicial estoppel defense. *Emerald*, 622 B.R. at 52; *see generally Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("[T]he party to be estopped [must] have convinced the court to accept its position in the earlier litigation" in order for judicial estoppel to be appropriate.). This Court agrees with that reasoning. Thus, even if Ms. Ebert's judicial estoppel defense was relevant, it would still be unavailing.

### E. **Motion to Compel**

Finally, Ms. Ebert appeals the denial of her motion to compel. In it, she sought discovery to support her equitable and judicial estoppel defenses. Because those defenses cannot avert subordination even if factually supported, further discovery is unnecessary. Thus, the bankruptcy court's denial is affirmed.

\*　　\*　　\*

The provision in Ms. Ebert's stock subscription which conditions stock issuance on IGB approval affords her a right to repayment. This right is properly characterized as a general unsecured claim. Yet, it is also a claim subject to subordination under 11 U.S.C. § 510(b)—a legal mandate which no equitable defense may thwart. The bankruptcy court's final order granting the Trustee's objections to Ms. Ebert's proofs of claim is therefore affirmed. Judgment will be entered for the appellee.

Date: July 1, 2022

John J. Tharp, Jr.
United States District Judge